Kurt J. KANN, Plaintiff,

v.

KEYSTONE RESOURCES, INC. Profit Sharing Plan; Keystone Resources, Inc. Profit Sharing Plan Committee; Robert D. Reese and Herman Becker-Fluegel, as Trustees, Defendants.

Civ. A. No. 83–1880.

United States District Court,
W.D. Pennsylvania.

Dec. 6, 1983.

Paul A. Manion, Pittsburgh, Pa., for plaintiff.

David B. Buerger, Pittsburgh, Pa., for defendants.

## OPINION

COHILL, District Judge.

### I. *Procedural Background*

Before us is a complaint arising under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), in which the plaintiff, Kurt J. Kann, charges that the defendants, Keystone Resources, Inc. Profit Sharing Plan, Keystone Resources, Inc. Profit Sharing Plan Committee and Robert D. Reese and Herman Becker-Fluegel, Trustees, have violated ERISA and the terms of the Plan by refusing to pay him his accrued vested benefits totalling $261,194.23. Mr. Kann also claims that the defendants violated Section 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4), by failing to provide him with a copy of the Trust Agreement which he requested after his application for the benefits was refused.

On July 27, 1983, plaintiff filed a complaint setting forth the aforementioned allegation and praying for various forms of equitable and legal relief. The plaintiff first seeks to enjoin the defendants from continuing to violate the Plan and ERISA and to order them to pay the benefits in which he asserts ownership. He also seeks, *inter alia*, punitive damages and attorneys' fees.

In addition to the complaint, Mr. Kann filed with this Court a Motion for Preliminary Injunction.

On September 22, 1983, we scheduled a hearing on plaintiff's Motion for Preliminary Injunction. Prior to taking testimony, counsel for the defendants presented a Motion to Intervene as a Plaintiff on behalf of Keystone Resources, Inc. ("Keystone") in which Keystone sought recovery of plaintiff's benefits on the basis that the corporate contributions to the Plan had been improperly and illegally authorized by plaintiff and two other executives of Keystone. We granted this motion to avoid circuity of actions.

Plaintiff then sought to withdraw his Motion for Preliminary Injunction, but still requested equitable relief. We granted the Motion to withdraw the Preliminary Injunction request and treated the hearing as a non-jury trial in equity.

Pursuant to Fed.R.Civ.P. 52(a), we now make the following Findings of Fact and Conclusions of Law.

### II. *Findings of Fact*

Plaintiff, Kurt J. Kann is 61 years of age and resides in New York City. He served as an executive vice-president and member of the Board of Directors of Keystone Resources, Inc. from March, 1969 until he resigned on February 17, 1983.

Defendant, Keystone Resources, Inc. Profit Sharing Plan ("Plan") is an individual account, defined contribution pension plan sponsored by Keystone for the benefit of its non-union employees. It was created on March 1, 1972 by the then Keystone Board of Directors, Kurt Kann (plaintiff), Robert S. Kahn and Stanton P. Silmore.

Defendant, Keystone Resources, Inc. Profit Sharing Plan Committee ("Committee") under the terms of the Plan, is the plan administrator and named fiduciary,

and has been accorded the responsibility for carrying out the provisions of the Plan.

Defendant, Robert Reese, is an executive vice-president of Keystone and a current trustee of the Plan.

Defendant, Herman Becker-Fluegel, is the current president and chairman of the board of Keystone. He is also a trustee of the Plan.

From March, 1969, until March, 1976, Messrs. Kann, Kahn and Silmore were the controlling shareholders, chief executive officers and the only directors of Keystone. With the authority to do so, they established the Plan, which became effective on March 1, 1972.[1]

The Plan was established to benefit the salaried, nonbargaining unit employees of Keystone. Each year, the Trustees of the Plan are to consider the earnings or accumulated earnings of Keystone to determine whether or not contributions should be made to the Plan. If it is decided that contributions are appropriate, payments are made to the Plan for the individual employees based upon the individual's annual compensation.[2] The general policy is and was to contribute 15% of any member's total yearly compensation. This criteria has been followed since 1972. The number of Plan members has ranged from 50 to 200, depending on the number of salaried employees.

An employee's benefits under the Plan vest 100% after eight years of service to Keystone. Upon leaving the employ of Keystone, a vested employee has the right to payment of benefits "as soon as administratively possible." Plaintiff's Ex. 1, p. 26.

After approximately 14 years of service, plaintiff Kann left the employ of Keystone on February 17, 1983. In a letter dated February 24, 1983, addressed to Mr. Paul Bennett, the Trust Administrator at Pitts-

burgh National Bank ("PNB"), Mr. Kann requested his share of the Plan fund. Plaintiff's Ex. 4. Receiving no response for a period of time, Mr. Kann then called Mr. Bennett who informed him that he was not permitted to release the money. Mr. Kann then wrote to defendant, Robert D. Reese, one of the Trustees of the Plan, requesting his benefits. Plaintiff's Ex. 4a. Mr. Reese did not respond to the letter, so Mr. Kann telephoned him. In their discussion, Mr. Kann was told that Mr. Becker-Fluegel was in charge and that he made the decisions. Sometime later, the plaintiff again called Mr. Reese who stated that they had not evaluated the amount to which Mr. Kann was entitled. Still Mr. Kann heard nothing from the Trustees regarding his request. In April, 1983, Mr. Kann sought legal advice.

On April 18, 1983, plaintiff's counsel sent a letter to the Plan Administrator requesting the total amount of benefits Mr. Kann had accrued. Plaintiff's Ex. 5. He also requested a copy of the Trust Agreement. Mr. Reese responded in a letter dated May 16, 1983 in which was enclosed a Statement of Participation from PNB which revealed that, as of December 31, 1982, Mr. Kann was 100% vested and the total amount credited to him was $261,194.23. Plaintiff's Ex. 6. A copy of the Agreement was not enclosed. The plaintiff did not receive a copy until July 28, 1983.

As of this date, Mr. Kann has not received his vested accrued benefits.

The foregoing facts are not disputed by the defendants. Instead, they point to additional facts which they allege support their affirmative defense, i.e. the Company's contributions to the Plan after the fiscal year ending February 28, 1975 were not formally approved by Keystone's Board

---

**1.** It has been amended from time to time to comply with the new federal laws and to make improvements. Most recently, the Plan was entirely restated, effective January 1, 1981.

**2.** There were some years that no contributions were made or contributions were only made to

certain employees in profitable divisions when the Trustees believed it would not be in the company's best interest. However, under the Plan, contributions could be doubled in the succeeding year to make up for the preceding year.

of Directors.[3] Therefore, those payments were not authorized, and Mr. Kann should only be entitled to the payments which had been officially authorized by the Board, the total being $52,460.00.

From 1969 until February 25, 1981, the chief executive officers of Keystone were Robert S. Kahn, President; Stanton P. Silmore, Executive Vice-President and Treasurer; and plaintiff, Kurt J. Kann, Executive Vice-President. These men retained these positions in 1972 when they also became the Trustees of the Plan. In addition to the aforementioned positions, Messrs. Kahn, Silmore and Kann were also the sole directors of Keystone until March 12, 1976.

From March, 1972 until February 28, 1975, yearly contributions to the Plan were discussed and formally approved at Board meetings, as reflected by the official minutes. After February 28, 1975, the Board of Directors, as such, never made any formal determinations as to amounts of Plan contributions, nor did they formally authorize any contributions. Messrs. Kahn, Silmore and Kann were not aware of the Plan provision which required formal board approval. However, all contributions, after that date, were nevertheless authorized and directed by Messrs. Kahn, Silmore and Kann, as Trustees of the Plan and chief executive officers of Keystone, when, after exercising their business judgment, they believed that the current or accrued earnings of Keystone justified such contributions. In addition, certain employees, including Messrs. Kahn and Silmore, made personal contributions. Mr. Silmore, acting on behalf of the Plan and the chief executive officers of Keystone, would direct the accounting department to make payments to the Plan, and he signed all of the checks. All payments to the Plan after the fiscal year ending February 28, 1975 through January 7, 1981, were made in this manner. No payments were made after January 7, 1981.

In March, 1976, the Lambert Brussels Corporation acquired approximately 80% of the common stock of Keystone. At that time, defendant, Herman Becker-Fluegel, and three other nominees of Lambert Brussels were elected directors.

Following that election, Messrs. Kahn, Silmore and Kann continued as the chief executive officers of Keystone until December, 1980, when they were advised by letter from Mr. Becker-Fluegel that their employment contracts would not be renewed.

On February 12, 1981, Messrs. Kahn, Silmore and Kann met with Mr. Becker-Fluegel, at which time Mr. Becker-Fluegel stated that he knew that the payments to the Plan had not received formal Board approval since 1975 and that this was a legal violation. However, he added that the current Board would not take any action against Messrs. Kahn, Silmore and Kann because he wanted "their continuing cooperation" in the management of the company. Trial Tr. 83.

With the belief that legal actions could be taken against them, Messrs. Kahn, Silmore and Kann agreed to cooperate. Although Mr. Silmore resigned from his position as Treasurer and Vice-President on February 25, 1981, he acted as a consultant and remained on Keystone's Board until September 17, 1981. Mr. Kahn resigned as President on February 25, 1981, however, he remained as Chairman of the Board until November 12, 1982. Mr. Becker-Fluegel assumed the presidency upon Mr. Kahn's resignation on February 25, 1981. The plaintiff remained as Vice-President and as a Director until February 17, 1983.

Concerning their trustee positions, Mr. Silmore relinquished his post on February 25, 1981, and was replaced on that date by Mr. Becker-Fluegel. Mr. Kahn resigned as trustee on November 12, 1982, and was replaced by Mr. Reese. Mr. Kann, though he never formally resigned, was replaced by Joseph R. Tomlinson.

On February 26, 1981, Mr. Silmore requested his vested profit sharing benefits

---

**3.** The pleadings, exhibits and stipulation conflict as to this date. Some state that Feb. 28, 1976 was the last date, others state 1975. The exact year is not material to this opinion.

totalling $312,473.94. Plaintiff's Exs. 16, 14a. He was subsequently paid on March 3, 1981. On June 2, 1982, Mr. Kahn asked for his benefits of $466,489.38, and he was paid twenty days later. Plaintiff's Exs. 17, 146. Only Mr. Kann's request was denied.

### III. Conclusions of Law

#### A. Jurisdiction

Mr. Kann's complaint alleges various violations of ERISA. Section 502 of ERISA, 29 U.S.C. § 1132(e)(1), provides that the United States district courts shall have exclusive jurisdiction over any civil action brought under ERISA. Thus, we have jurisdiction to decide the issues in this case.

#### B. Equity

■ A prayer for equitable relief is appropriate in ERISA actions. Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), provides in part that:

> A civil action may be brought by a participant, ..., (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief...

In addition to this statutory language, courts have interpreted Congress' silence on the right to a jury trial in ERISA cases as a sign of its intention that suits for pension benefits are equitable. *Wardle v. Central States, Southeast and Southwest Areas Pension Fund*, 627 F.2d 820 (7th Cir.1980). *See also, Need v. Thomas*, 75 L.R.R.M. 2699 (M.D.Pa.1980). As such, even though the defendants argue that this case raises only legal issues, we will proceed to analyze plaintiff's claims with equitable principles and relief in mind.

#### C. ERISA Violations

Several sections of ERISA have been cited by the plaintiff as having been violated by the defendants. To simplify our conclusions as to those various claims, we will look at the sections individually.

1. Sections 203 and 206(d)(1) of ERISA, 29 U.S.C. §§ 1053 and 1056(d)(1).

These sections provide that vested rights and benefits under a pension plan may not be forfeited (Section 203) or alienated (Section 206(d)(1)) by any party except in very limited circumstances, none of which are applicable to this case. *See, Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981).

■ Plaintiff argues that the defendants violated these sections by failing to pay his vested benefits upon his request. A pension plan's failure to make benefit payments to an eligible participant is an impermissible forfeiture under ERISA. *Smith v. CMTA–IAM Pension Trust*, 654 F.2d 650 (9th Cir.1981).

The defendants allege that one of the reasons they did not pay Mr. Kann his benefits is because he breached his fiduciary duties as a director and officer of Keystone and as a trustee of the Plan by agreeing to unauthorized payments to the Plan and by authorizing excessive contributions for the benefit of Messrs. Kahn, Silmore and himself. Therefore, argue the defendants, since he unlawfully breached his duties, he forfeited his rights under the Plan and is prohibited from collecting his benefits.

Section 203 of ERISA requiring that pension benefits be nonforfeitable was designed, in part, to prevent plan administrators and trustees from withholding vested benefits on the grounds that the participant was a "bad boy." *Winer v. Edison Brothers Stores Pension Plan*, 593 F.2d 307, 311 (8th Cir.1979).

In considering the passage of ERISA, the House Committee on Ways and Means reported:

> With ... limited exceptions ..., no rights, once they are ... vested, may be lost by the employee *under any circumstance* ... For example, a vested benefit is not to be forfeited because the employee ... [was] in some ... way ... considered "disloyal" to the employer.

(Emphasis supplied.) *Id.* at 311, *citing*, H.R.Rep. No. 93–807, 93d Cong., 2d Sess. 60 (1974), U.S.Code Cong. & Admin.News 1974, p. 4639.

In *Vink v. Shv North America Holding Corporation*, 549 F.Supp. 268 (S.D.N.Y. 1982), plaintiff had been convicted of defrauding the employer's subsidiaries. As a result of the conviction, the administrators of the pension plan withheld payment of the plaintiff's vested benefits. The district court held that the benefits could not be forfeited, even if the employee committed a fraud on the company. As such, the plan was ordered to release the plaintiff's benefits.

■ In light of these cases, the unambiguous language of Section 203 of ERISA, and the legislative history of ERISA, it is clear that Mr. Kann's benefits may not be forfeited and withheld by the defendants on the basis that payments to the Plan were not formally authorized, absent some fraud by Mr. Kann with respect to the contributions themselves. In *Vink*, the employee was convicted of an unrelated fraud, and the court held that he was still entitled to his share of the pension plan. There was no showing that Mr. Kann's conduct was fraudulent, and he cannot be punished by forfeiting his vested benefits.

■ We must also note that the defendants failed to meet the requisite burden of establishing a breach of fiduciary duties on the part of the plaintiff for authorizing excessive contributions on his own behalf. In order to prove that a corporate officer breached his fiduciary duties by voting on his own compensation, it must be established that the act amounted to corporate waste or fraud. *Chambers v. Beaver—Advance Corporation*, 392 Pa. 481, 140 A.2d 808 (1958).

In the case, *sub judice*, the contributions to the Plan were based on a percentage of the individual salaries. The employees with the higher salaries benefited from a larger contribution to the Plan. Though Mr. Kann did receive more benefits than most, his salary was higher than most. At no time did the percentage rate increase for only Mr. Kann. In fact, there were some years that no contributions were made to Mr. Kann's account because the yearly earnings of Keystone did not justify it. The contributions to Mr. Kann's account, when made, were not preferential or excessive, but were consistent with the terms of the Plan.

The parties, in their Proposed Findings of Fact and Conclusions of Law, went into in-depth arguments and analysis of the yearly percentage of Keystone's assets which were contributed to the Plan, the amount credited to Messrs. Kahn, Silmore and Kann, the amounts contributed to various divisions of Keystone, and so forth. We will not make findings as to these arguments since we do not believe that defendants have shown that Mr. Kann authorized excessive contributions to himself and we hold, therefore, that he did not breach his fiduciary duties.

2. Section 408(c) of ERISA, 29 U.S.C. § 1108(c).

■ Another reason proffered by the defendants for their refusal to pay Mr. Kann is because he was still a Plan trustee at the time he requested his benefits, therefore, it would be a breach of his fiduciary duties to receive plan benefits.

Section 408(c) of ERISA stands for the contrary position. This section permits a plan fiduciary to receive benefits to which he may be entitled as a plan participant, so long as the benefit is computed and paid in the same fashion as is done for other plan members.

As we have previously stated, there is no evidence that Mr. Kann was to be singled out for preferential treatment. His rights and benefits inured pursuant to the Plan, as did every other eligible Keystone employee.

3. Section 403(c)(1) of ERISA, 29 U.S.C. § 1103(c)(1).

Section 403(c) of ERISA provides that plan assets shall not benefit the employer and shall be held for the exclusive purpose of providing benefits to the plan members. The plaintiff argues that the defendants have violated this provision by refusing to release his money. We agree.

■ Contributions to a pension plan are irrevocable. *Crown Cork and Seal Company, Inc. v. Teamsters Pension Fund of Philadelphia,* 549 F.Supp. 307 (E.D.Pa. 1982). Even if payments to the plan are made by mistake, ERISA does not intend that the risk of mistake be on the plan. *Id.* Therefore, any unauthorized contribution paid to the Plan by the Keystone directors on the mistaken belief that they had the power to do so cannot inure to the benefit of the company. These monies must be used only for the purpose of paying vested pension benefits to eligible participants, such as the plaintiff.

4. Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1).

■ The final ERISA provision which the plaintiff claims was violated by the defendants states in part that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants..." 29 U.S.C. § 1104(a)(1).

Courts have recognized that most trustees will have dual loyalties to the pension plan and the sponsor corporation. *Donovan v. Bierwirth,* 538 F.Supp. 463 (E.D.N.Y.1981), *modified on other grounds,* 680 F.2d 263 (2d Cir.1982). It has also been established that these trustees may retain their fiduciary positions in spite of a potential conflict of interest. *Id.* However, section 1104(a)(1) was drafted as a safeguard and guidepost. This section clearly provides that, when acting on behalf of a fund, a plan trustee's *only* loyalty is loyalty to the fund. *Id.* Any decisions must be made "with an eye single to the interests of the participants and beneficiaries." *Donovan,* 680 F.2d at 271.

In the case at bar, the defendants' decision not to pay Mr. Kann his accrued benefits was not made "with an eye single" to Mr. Kann's interests. It was made with only the company's interests in mind. Though the statutory language of ERISA and the legal precedent provides that the company's interests must remain in the background, the defendants in this case did otherwise. Even if the Plan fiduciaries decided in good faith that they were not legally able to pay Mr. Kann, the main consideration in reaching this decision was the welfare of Keystone, and not the plan participant. As such, the defendants violated the fiduciary duties created by ERISA.

D. *Defendants' Common Law Defense*

■ Defendants' failure to pay Mr. Kann's vested benefits upon his request was a violation of several ERISA sections, and a breach of the fiduciary duties prescribed by the federal statute. The defendants, however, assert an affirmative common law defense to explain their actions. They argue that, under corporation law, the payments to the Plan for Messrs. Kahn, Silmore and Kann were not formally authorized by Keystone's Board of Directors. Therefore, since the money does not belong to the Plan, Mr. Kann has no rights to it as a plan participant. They further allege that Mr. Kann breached his fiduciary duties by agreeing to these unauthorized contributions and by agreeing to contributions which were not justifiable, based upon Keystone's assets. As a result, Mr. Kann may not benefit from his wrong doings. We have previously addressed this issue and held to the contrary. We, therefore, will not discuss it again.

The facts clearly establish that the Plan contributions, after the fiscal year ending in February, 1975, were made without formal Board approval, contrary to the Plan provisions. It has also been established that Keystone, at the time in question, was a closely held corporation run primarily by Messrs. Kahn, Silmore and Kann. For a number of years, they were the sole stockholders and acted as the only officers and directors of Keystone. It was during this time that they also became the trustees of the pension plan which they created.

■ Since Keystone was a closely held corporation, where the members of the Board personally conducted and directed business, it cannot be held to the same strict formalities as are large corporations. *Chambers v. Beaver-Advance Corporation,* 392 Pa. 481, 140 A.2d 808, 814 (1958).

Directors' actions, in such corporations, need not be proven by board minutes. *Miller v. South Hills Lumber & Supply Company*, 334 Pa. 293, 6 A.2d 92, 95 (1939). *See also, Mickshaw v. Coca Cola Bottling Company, Inc.*, 166 Pa.Super. 148, 70 A.2d 467 (1950). Though Messrs. Kahn, Silmore, and Kann did not give formal board approval to the contributions, and did not discuss the contributions at board meetings or record any discussions in the minutes, as a closely held corporation, they were not required to do so.

Messrs. Kahn, Silmore and Kann, from 1972 (the inception of the Plan) until 1976 (when Mr. Becker-Fluegel became a director), were the sole officers and directors of the company. As such, their decisions regarding company matters were decisions of the company's board, even though not made and recorded at formal board meetings. In such a situation, it would have been superfluous for the three men to have decided, as officers and trustees, to make a contribution, then have to call another meeting which the same three men would attend to "formally" authorize the decision. If, as officers and trustees, they agreed to the contributions, it is only logical to assume that they would have also agreed as directors. While it might have been preferable, the men were not required to stop and switch corporate hats at each step of the decision-making process. Each man wore all three hats at all times, and each decision was made as such.

After 1976, when Mr. Becker-Fluegel and other Lambert Brussels candidates became Keystone board members, contributions were still being made to the Plan without formal board approval. Though no formal approval was given, the fact that defendant Mr. Becker-Fluegel and the other new directors did not disavow these contributions resulted in a ratification of the payments. *Rednor & Kline, Inc. v. Department of Highways*, 413 Pa. 119, 196 A.2d 355 (1964). The defendants argue, however, that Mr. Becker-Fluegel could not have ratified the contributions since he did not know of them until much later.

In *Rednor*, the Pennsylvania Supreme Court, addressing a similar issue, held that

> after an act of a corporate official who has or is in apparent authority, has *or should have* become known, failure to promptly disavow or repudiate such action raises a presumption of ... affirmance and ratification.

(Emphasis supplied.) *Rednor*, 196 A.2d at 358. *See, Collins v. Parkton Compound Boiler Company*, 195 Pa.Super. 364, 171 A.2d 576 (1961) (Unauthorized acts may be ratified by "passive acquiescence.")

As a director, Mr. Becker-Fluegel was in a position where he should have known of the contributions to the Plan. Cancelled corporate checks to the Plan, continual Plan amendments by the Board, corporate records, and documents were available to Mr. Becker-Fluegel. It was within his fiduciary duties to Keystone to be fully appraised of all company dealings, including the retirement benefits for the non-union employees. Even if he did not have actual knowledge, he had constructive knowledge of the contributions. Since he did not promptly disavow this action, he must be deemed to have ratified it.

The defendants rely on *Stone v. American Lacquer Solvents Company*, 463 Pa. 417, 345 A.2d 174 (1975) which held that a corporation may only be bound by the acts which are formally approved at board meetings. The *Stone* case, however, is distinguishable; there, the defendant corporation was not a closely held corporation. We must also note that the Pennsylvania Supreme Court prefaced its finding that directors may only bind a corporation at a legal meeting with this: "As a general rule..." *Stone*, 345 A.2d at 176. Thus, we believe that the Pennsylvania Supreme Court recognized that there are situations, such as those involving a closely held corporation, in which this "general" rule would not be applicable.

Though we have found that Mr. Becker-Fluegel and the other directors had constructive knowledge of the unauthorized contributions, the evidence further indicates that they also had actual knowledge,

thus consciously ratifying the actions of Messrs. Kahn, Silmore and Kann.

As early as 1981, Mr. Becker-Fluegel knew of the existence of the pension fund and the amounts of contributions to it. Andrew R. Peacock, a prior Vice-President and Treasurer of Keystone, testified that, in the first quarter of 1981, he learned from Mr. Becker-Fluegel at a luncheon meeting that Becker-Fluegel and the other directors knew of the unauthorized contributions to the Plan, however, he did not believe that the time was proper for legal actions. Trial Tr. pp. 102–103.

In early August, 1981, Mr. Becker-Fluegel requested and received from Mr. Peacock, a written evaluation of the contributions to the Plan. Trial Tr. p. 81.

Mr. Becker-Fluegel, himself, testified that in early 1981 he informed the other directors that the board had not formally approved contributions to the Plan after 1975. Trial Tr. p. 85. The defendants' own pleading entitled "Defendants' Objections to Plaintiff's Proposals" states that "[w]e agree that Becker-Fluegel knew of payments to the Plan on February 12, 1981." *See,* Defendants' Objections, p. 5, ¶ 40.

All of these discoveries occurred while Mr. Becker-Fluegel was a director of Keystone. He chose to do nothing to address the situation at that time. Thus, his "passive acquiescence" gave authority to the actions of Messrs. Kahn, Silmore and Kann.

The most significant evidence supporting a finding that Mr. Becker-Fluegel and the others acquiesced to the payments is the fact that, while Mr. Becker-Fluegel was a trustee of the Plan, he and the other defendants authorized the payment of pension benefits to Mr. Silmore in 1981 and Mr. Kahn in 1982. At the time these payments were made, they knew that the contributions had not been formally authorized by the Board, yet they agreed to pay two of the men who had acted no differently than the plaintiff. In addition, if the unauthorized contributions really belong to the Company, as the defendants argue, then the Plan should be void of any money paid

in after 1975, even that money which was contributed to other plan participants' accounts, because there was no formal board authorization for any such payments. Yet, Mr. Becker-Fluegel and the other defendants continue to pay other employees upon request.

In paying these other plan participants, the defendants used the contributions from the Company. This constituted a ratification of the unauthorized acts, and they may not now use original lack of authority as a defense. *In the Matter of Eton Furniture Company,* 286 F.2d 93 (3d Cir.1961).

Not only did the defendants ratify the actions of Messrs. Kahn, Silmore and Kann in this way but they are equitably estopped from claiming otherwise. The Third Circuit has applied the doctrine of equitable estoppel to pension plan cases. *Rosen v. Hotel & Restaurant Employees and Bartenders Union,* 637 F.2d 592 (3d Cir.1981), *cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981).

Before applying the doctrine of equitable estoppel, we must analyze the interplay of conduct between the parties.

█ As to the party being estopped, it must be shown that: 1) by acts, representations or silence, one party induced another to believe certain facts; 2) the representing party expected the other party to act upon such representations; 3) the party making the representations possessed actual or constructive knowledge of the true facts. *GAF Corporation v. Amchem Products, Inc.,* 399 F.Supp. 647, 657 (E.D.Pa.1975), *rev'd on other grounds* 570 F.2d 457 (3d Cir.1978), and cases cited therein.

As to the party seeking the estoppel, the law requires: 1) lack of knowledge of the truth; 2) reliance upon the representation of the other party; 3) action based upon that representation which changed his position prejudicially. *Id.*

In applying the first set of precepts to the defendants, we find that each element has been met.

By his representation to Mr. Kann at the February, 1981 meeting that no legal action would be taken regarding the contributions not formally authorized, Mr. Becker-Fluegel expected Mr. Kann to stay on at Keystone, even though his contract had been terminated and obvious animosities existed. Mr. Becker-Fluegel made this representation even though he knew, or should have known, that the Board of Directors was angry over the situation, legal action had been seriously considered, and that such an assurance was not possible.

As for the elements of conduct regarding Mr. Kann, these also have been proven.

Mr. Kann believed that no legal actions would result regarding his pension plan benefits, in light of Mr. Becker-Fluegel's assurances. He relied upon this representation and stayed on at Keystone for two more years in spite of the growing problems and poor working relationships. Eventually the animosities proved to be too great, and Mr. Kann left, only to learn that he would not receive the vested pension benefits to which he was entitled.

For the foregoing reasons, we conclude that the defendants ratified the contributions to the Plan and are equitably estopped from claiming otherwise. Therefore, their common law defense must fall.

### E. Copy of Trust Agreement

In Count II of the plaintiff's complaint, he claims a violation of Section 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4), and seeks the statutory penalty provided for in 29 U.S.C. § 1132(c).

29 U.S.C. § 1024(b)(4) provides in pertinent part that the "Administrator shall, upon written request of any participant..., furnish a copy of the latest... trust agreement..."

Section 1132(c) states:

Any administrator who fails or refuses to comply with a request for any information which such administrator is required ... to furnish to a participant ... within 30 days after such request may in the courts discretion be personally liable to such participant ... in the amount of up to $100 a day from the date of such failure or refusal...

On April 18, 1983, plaintiff, through his counsel, sent a written request for a copy of the trust agreement to the Plan administrator. On July 28, 1983, more than thirty days after the request and a day after suit was filed, Mr. Kann received a copy.

It is clear that the defendants violated, *per se*, the statute. However, as stated in 29 U.S.C. § 1132(c), the penalty is not automatic but is within the court's discretion.

After careful consideration of the facts and circumstances regarding the trust agreement, we do not believe a penalty is warranted in this case.

The defendants state that it took a substantial amount of time to go through the relevant documents to try and find the trust agreement. They were unsuccessful and finally had to obtain a copy from Keystone's former attorney.

Although plaintiff contends that this was a mere tactical delay and that the defendants could have contacted the company's attorney sooner in order to get a copy, we do not agree. With the recent turnover in trustees, corporate offices and files in various cities and the need to obtain new counsel, things were in a turmoil and no doubt contributed to the delay. There is no evidence that the defendants intentionally or in bad faith refused to send a copy of the trust agreement.

In addition, Mr. Kann did receive a copy of the agreement the day after his complaint was filed with this court, giving him and his counsel plenty of time to review it prior to trial. Since "[t]here is no indication that [his] rights have been in any way prejudiced by the failure to furnish [him] with the [trust agreement], ... the court, in its discretion, ... will not award the penalties provided by the Act." *Pollock v. Castrovinci*, 476 F.Supp. 606, 618 (S.D.N.Y.1979), *aff'd*, 622 F.2d 575 (2d Cir.1980).

### F. Punitive Damages

Courts have held that, in certain situations, punitive damages were appropriate in ERISA cases. *See, Jiminez v. Pioneer*

*Diecasters,* 549 F.Supp. 677 (C.D.Cal.1982); *Bittner v. Sadoff & Rudoy Industries,* 490 F.Supp. 534 (E.D.Wis.1980). The plaintiff asserts that this is one of those situations.

It is the plaintiff's contention that the defendants consciously made the decision to violate their fiduciary duties, that they did not advise the plaintiff as to why his application for benefits was denied, and that the defendants' own defense is an admitted violation of their duties under ERISA. These factors, argues the plaintiff, show bad faith and malicious intent on the part of the defendants, and therefore, substantiate an award of punitive damages.

■ Under Pennsylvania law, before a court may impose punitive damages, it must find that the defendant committed "outrageous conduct." *Olsen v. United States,* 521 F.Supp. 59 (E.D.Pa.1981), *aff'd sub nom. Ford Motor Company v. Cooper,* 688 F.2d 820 (3d Cir.1982).

"Outrageous conduct" is defined as an act done with a bad motive or with "reckless indifference" to another's interests. *Smith v. Brown,* 283 Pa.Super. 116, 423 A.2d 743 (1980). *See also, Golomb v. Korus,* 261 Pa.Super. 344, 396 A.2d 430 (1978).

■ Though we have found that the defendants violated some sections of ERISA and that misrepresentations were made to the plaintiff by defendant, Mr. Becker-Fluegel, we do not believe that the conduct of the defendants has met the requisite test for awarding punitive damages. The defendants' conduct, especially Mr. Becker-Fluegel's, was not so shocking as to be labeled "outrageous." We, therefore, deny plaintiff's request for punitive damages.

### G. *Pre-Judgment Interest*

Plaintiff seeks pre-judgment interest on the Plan's current account balance in his name.

■ Though ERISA does not specifically provide for pre-judgment interest, courts have allowed it where a plan participant was wrongfully denied his pension benefits. It is within the district court's discretion to award pre-judgment interest.

*American Timber & Trading v. First National Bank of Oregon,* 690 F.2d 781 (9th Cir.1982).

In *Dependahl v. Falstaff Brewing Corporation,* 653 F.2d 1208 (8th Cir.1981), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981), the leading case on the issue of pre-judgment interest awards in ERISA cases, the court held that pre-judgment interest is applicable in such cases and that it is "necessary in order that plan participants obtain 'appropriate equitable relief.'" *Id.* at 1219, *quoting,* 29 U.S.C. § 1132(a)(3)(B). In so finding, the court stated that, while the plaintiff was being denied his vested benefits, the defendant plan was benefitting by gaining additional interest. Therefore, in order to make the plaintiff whole, pre-judgment interest must be awarded.

Since this was a case of first impression for the Eighth Circuit, the *Dependahl* court had to determine what the rate of interest should be. Since the court decided that the rate of interest to apply in a case involving a federal statute, such as ERISA, is a federal question, it reasoned that it must look to the most analogous federal statute; i.e. 28 U.S.C. § 1961 (statute providing for post-judgment interest). The Eighth Circuit held that, to be consistent, the same rate used for post-judgment interest should be used for pre-judgment interest.

The *Dependahl* case was decided in 1981, at which time 28 U.S.C. § 1961 provided that post-judgment interest was to be awarded at the rate allowed by state law. Therefore, the court awarded pre-judgment interest based on the percentage set by state law from the date of demand.

■ We agree with Mr. Kann that he is entitled to pre-judgment interest. He was denied his pension benefits, even though Messrs. Kahn and Silmore received theirs. It is obvious that ill-feeling between the plaintiff and the defendants was one of the reasons for the denial. While Mr. Kann was being wrongfully deprived of his money and the substantial sum of interest he

could have earned on it, the defendants had the use of it. In order that Mr. Kann may be made whole and gain complete equitable relief, we find that he must be awarded pre-judgment interest.

As for the rate, the plaintiff asks for the current commercial rate. We have found no cases in our circuit which would assist us, and believe this to be a case of first impression for the courts in the Third Circuit. We are, however, more fortunate than the Eighth Circuit because we have their well-reasoned and persuasive *Dependahl* opinion as a guidepost. We agree with that court that the rate of pre-judgment interest in an ERISA case is a federal question which must be governed by federal law. Therefore, we adopt the Eighth Circuit's holding that 28 U.S.C. § 1961, the analogous section for post-judgment interest, is to be applied.

Since the *Dependahl* case, Congress has amended § 1961. The rate for post-judgment interest is now to be computed at a

> rate equal to coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty two week United States Treasury bills settled immediately prior to the date of the judgment.

28 U.S.C. § 1961(a), as amended, April 2, 1982. Since this section deals specifically with post-judgment interest, the Treasury bill rate to be used is that which was "settled immediately prior to the date of judgment." *Id.* In the case at bar, we must determine the rate for pre-judgment interest, therefore, in accordance with the holding in *Dependahl*, we will use the rate obtained immediately prior to the date of the first demand made by the plaintiff for his vested benefits, i.e. February 24, 1983.

In a memorandum addressed to all United States Clerks of Courts, dated February 18, 1983, from Dewey R. Heising, Chief of the Division of Financial Management for the Administrative Office of the United States Courts, it is stated that the rate of interest from February 18, 1983 (the rate settled immediately prior to February 24,

1983) was 8.99%. We, therefore, will direct the Clerk of Court for the Western District of Pennsylvania to compute the pre-judgment interest by applying a rate of 8.99% on the total vested benefits that Mr. Kann had in the Plan on February 24, 1983, i.e. $261,194.23.

### H. *Attorney's Fees*

■ Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1) provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." *See Ursic v. Bethlehem Mines*, 719 F.2d 670 (3d Cir.1983). Unlike most federal statutes which allow for attorney's fees, a fee award to the prevailing party in an ERISA case is not mandatory. *Id.* Five policy factors must be considered before a court may award such fees in an ERISA case: 1) the offending parties' bad faith or culpability; 2) the ability of the offending parties to pay the fees; 3) the deterrent effect such an award would have on the offending parties; 4) the benefit conferred on the pension plan members as a whole; and 5) the relative merits of the parties' position. *Id.* at 673, and cases cited therein.

In applying these factors to the case, *sub judice*, we believe an award of attorney's fees to the plaintiff is warranted.

In considering the first factor, we held the defendants to be in clear violation of several of the ERISA provisions. In addition, corporate politics and the ill-feelings which accompany such politics were a vital contributing factor in the defendants' decision not to pay the plaintiff. Definite culpability on the part of the defendants has been shown.

As for the ability of the defendants to pay the award, the corporate and Plan records introduced at trial show the defendants to be in a comfortable financial position. A reasonable award of fees will not overly tax or burden the defendants.

The third and fourth factors may be considered jointly. By ordering the defendants to pay attorney's fees, we believe the defendants will be less likely and not so

quick to deny benefits to other eligible Plan participants. This will, therefore, be a deterrent factor and will benefit the other members of the Plan who will seek benefits which accrued after 1975.

The fifth factor, the relative merits of the parties' position, has been discussed at length. However, for purposes of the attorney's fees analysis, we conclude that the affirmative defense asserted by the defendants was not sufficient to overcome the proof of their violations of ERISA. Their defense was not meritorious in excusing their conduct.

We, therefore, conclude that the plaintiff is entitled to reasonable attorney's fees and expenses, and we will direct plaintiff's counsel to submit an affidavit showing a complete breakdown of fees and expenses incurred in this lawsuit.

An appropriate order will follow.

### ORDER OF COURT

AND NOW, to-wit, this 6th day of December, 1983, in accordance with the foregoing Findings of Fact and Conclusions of Law, it is hereby ORDERED, ADJUDGED and DECREED that judgment be and hereby is entered for the plaintiff and against the defendants in the amount of $261,-194.23.

It is further ORDERED, ADJUDGED and DECREED that:

1) The Clerk of Court of the Western District of Pennsylvania be and hereby is directed to compute prejudgment interest on $261,194.23 in accordance with 28 U.S.C. § 1961(a), to be computed from February 24, 1983.

2) Plaintiff's counsel must submit with this court a statement of attorney's fees and expenses no later than December 15, 1983.