John J. DEVINE, Jr., Plaintiff,

v.

XEROX CORPORATION, Defendant.

Civ. A. No. 84–154–JJF.

United States District Court,
D. Delaware.

Dec. 11, 1986.

352

Melvyn I. Monzack, of Walsh & Monzack, Wilmington, Del., for plaintiff.

John S. Grady, Dover, Del., for defendant.

## OPINION

FARNAN, District Judge.

Plaintiff, John J. Devine, Jr., brought this action for severance pay against his former employer, the Xerox Corporation. In addition to seeking $21,684.00 in severance pay, plus interest dating from his August, 1983 separation from Xerox, Devine also seeks punitive damages, attorneys' fees, and the costs attributable to this action. The Court, having previously held that Xerox's severance pay plan was an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1). *Devine v. Xerox Corp.*, 625 F.Supp. 603, 607 (D.Del.1985). This opinion constitutes the Court's findings of fact and conclusions of law following trial on the issue of Devine's entitlement to severance pay under the terms of the Xerox Personnel Manual.

## I. FACTUAL BACKGROUND.

Upon consideration of the evidence presented at trial, coupled with my evaluations of the credibility of the testifying witnesses, the Court makes the following findings of fact.

Devine was employed as a salesman for Xerox from 1966 through the greater part of 1983. A backward glance over Devine's tenure at Xerox points to the conclusion that Devine was simultaneously a talented salesman and a difficult, at times headstrong, employee. The evidence presented at trial discloses that Devine was frequently at loggerheads with Xerox management in general and his immediate supervisors in particular over his handling of major sales accounts. Despite the occasional irritation Devine may have caused Xerox over the course of his employment there, Xerox took no definitive action until 1982, when Devine's sales figures dipped, for the first time, to what the company considered an unacceptable level.

In the years preceding 1982, Devine's sales performance ranged from good to excellent. Indeed, Xerox itself acknowledges this to be the case. For example, Devine received numerous awards in recognition of his prowess as a salesman. Numbered among those awards are thirteen Par Club Awards and seven President's Club Awards over the course of an employment relationship that spanned a total of seventeen years. Plaintiff's Exhibit 14. Moreover, the evidence presented at trial indicates that, until problems with Devine's sales performance emerged in 1982 and 1983, he received favorable evaluations and performance appraisals from his superiors. A representative sample of the comments contained in Devine's evaluations includes this excerpt from his 1980 performance appraisal:

Jack has a pure major account assignment and he has handled it with poise and professionalism. He has been involved with some difficult situations ... and I feel he has done an excellent job through all the problems. Jack's numbers are driven primarily by the centralized marketplace which he has had great success (sic)....

Plaintiff's Exhibit 15, p. 7.

Devine's 1981 performance appraisal is similarly laudatory:

From a marketing standpoint, Jack put it all together in 1981 with a good balanced performance making all three gates and a net add percentage of close to 200%, which should put him among the top seven in the branch. Jack's strength centered around his ability to relate to the key decisionmakers in his major account assignments. With Jack's experience and his pleasant personality, he is usually able to raise his level of contact through eliminating numerous levels of decisionmaking.

Plaintiff's Exhibit 16, p. 7.

In April, 1982, John Riley replaced Joseph Teti as Devine's immediate supervisor at Xerox. Despite Riley's concern over Devine's lackluster sales performance for the first half of 1982, he nonetheless recommended that Devine be promoted to account executive. Plaintiff's Exhibit 10. This recommendation was considered, duly approved by the appropriate personnel within the Xerox management hierarchy, and became effective July 1, 1982. *Id.* The comments that accompanied Devine's nomination for account executive require no interpretation. Riley, the Wilmington Sales Manager, noted: "After some up and down years, Jack has turned things around and really come on strong the last two years. He was 173% in 1980 and 200% in 1981 in a difficult assignment. Jack is a professional salesman driven by compensation and a desire to do a good job." Riley's supervisor, the Wilmington Branch Manager, added: "Jack is a sixteen year employee. He is a professional Marketing Executive who has made many contributions to the branch during his tenure. His assignment consists of four of the top major accounts in the Branch. He has handled this assignment in a mature and professional manner." Plaintiff's Exhibit 10. Notwithstanding his promotion to account executive, and the plaudits that accompanied it, 1982 did not end well for Devine. During that year, Xerox reduced the number of accounts assigned to Devine from eleven to four. At the same time, his sales quota was increased. While Devine's four accounts were the largest in the Wilmington area, and therefore had the greatest

potential for generating high volume sales, his primary account, Hercules, suspended all major purchasing decisions pending a planned relocation to new corporate headquarters. As a result, Devine's 1982 sales performance ranked lowest among the sales representatives in the Wilmington office, and correspondingly, his compensation dropped from $52,000.00 in 1981 to $38,000.00 in 1982.

Devine's decline took on a more precipitous slope in January of 1983, when Robert Berman took over as the Wilmington Branch Manager. In this capacity, Berman had direct supervisory authority over Riley, who in turn, supervised Devine. Devine had previously worked under Berman's supervision and apparently the working relationship had not been positive. Although Berman was not called to testify at trial, one witness testified that at a supervisors' meeting held in February of 1983, Berman targeted Devine and several other employees, all of whom have either left Xerox or been demoted, as employees who were "no good" and whose failures should be documented in order to provide a basis for subsequent action. Trial Transcript, testimony of Michael Mavromates. Devine's performance for early 1983 continued to falter; on March 1, 1983, Devine received notice that Xerox was placing him on "Formal Counseling" status. Plaintiff's Exhibit 7.

## II. THE "CORRECTIVE ACTION" PROCESS.

The Xerox Personnel Manual in effect at the time Devine was placed on formal counseling status outlines a four-step policy of progressive discipline to be applied to employees whose performance is deemed unacceptable. Plaintiff's Exhibit 5. The first step, counseling, suggests that the employee and his or her supervisor should review the employee's job requirements in order to clarify any misunderstanding on the employee's part. The supervisor is instructed to define the problem in specific terms and "work with the employee in a helpful manner to identify the requirements for performance improvement which will serve as

a solution to the problem." Plaintiff's Exhibit 5, at 1. Step two involves an oral warning, which carries forward the goal of defining the problem with specificity, and emphasizes suggested modes of resolution. At this stage, the employee is advised that a written warning, or possible termination, could result if his or her problem is not resolved. Plaintiff's Exhibit 5, at 2. Formal warning is the third step in the corrective action process. Unlike the first two steps in the process, formal warning consists of a written warning. According to the Personnel Policy Manual, the warning should, again, define the problem and suggest ways in which it may be corrected. The written communication should also emphasize the seriousness of the problem and indicate the possibility (if not likelihood) that probation and termination may result if improvements are not forthcoming. *Id.* Probation is the fourth and final step in the corrective action process. At this stage the errant employee is again advised that termination may result if certain improvements in performance are not realized within a specified time period. *Id.* at 2, 3.

Xerox, having initiated corrective action against Devine by placing him on formal counseling status, gave Devine sixty days in which to effectively address management concerns regarding his sales performance, his attitude, and the activity levels in his accounts. Plaintiff's Exhibit 7. As anticipated by Berman, who participated in the decision to place Devine on formal counseling status, Devine's reaction to his change in status was anything but positive. Plaintiff's Exhibit 9.

On May 4, 1983, Devine was notified that he had failed to satisfy the objectives set forth at the initiation of the formal counseling process. This letter also informed Devine that his status within the corrective action process had been elevated to formal warning. Plaintiff's Exhibit 8. The testimony adduced at trial reveals that placement in the corrective action process is negatively perceived by Xerox employees because it leads, almost inevitably, to demotion, resignation or termination. Trial Transcript, testimony of James Barnett and John J. Devine. Devine realized no sub-

stantial improvement in his sales performance during May, June, and July of 1983, and saw little hope for improvement in the near future; he therefore concluded that his days at Xerox were numbered. This conclusion was not without foundation. During his seventeen year tenure at Xerox, Devine had observed a number of senior sales personnel undergo demotion, or transfers to less attractive assignments within the company. According to Devine, these demotions and transfers ultimately culminated in resignation. Trial Transcript, testimony of Devine. Devine's perception that his star was on the wane was corroborated by the testimony of a former Xerox manager. Mr. James R. Barnett, who was employed by Xerox for nearly fourteen years, characterized the formal warning stage of the corrective action process as the "kiss of death" for sales representatives. Trial Transcript, testimony of James R. Barnett, at 7, 8. Other Xerox employees testified that in their observations of employees placed on formal warning, few, if any, positive results had been realized. Given the unrebutted testimony of current and former Xerox employees familiar with the corrective action process, the Court finds that Devine correctly perceived that he was on the way out.

Due to the rapid escalation of his corrective action status, Devine tendered his letter of resignation to John Riley on July 25, 1983. The letter, as set forth below, clearly states the impetus for the resignation as well as Devine's belief that he was entitled to severance pay:

Dear John [Riley],

I have been a 17 year employee and, for the most part, have been an overachiever (13 Par Clubs/7 President's Clubs). However, due to the pressure from Xerox and the formal counseling status, I recognize I do not have a future at Xerox.

Please accept this letter as my formal resignation effective 8/15/83. I have 6 weeks vacation accrued.

Due to the fact that this resignation has been prompted by my corrective action status, I am entitled to the accumu-

lated severance pay based on my seniority.

Sincerely,
Jack Devine
Account Representative
Signature of John Riley

Plaintiff's Exhibit 12.

Riley testified that, in a meeting with Devine, he accepted and approved Devine's letter of resignation. This testimony is corroborated by the fact that Riley signed the letter. *Id.* He made no attempts to dissuade Devine from resigning, which in effect confirmed Devine's perception of his bleak future at Xerox. Riley also agreed to help and support Devine in his quest for severance pay. Trial Transcript, testimony of John S. Riley. It further appears that Riley's supervisor, Robert Berman, worked with Riley in an attempt to classify Devine's resignation as a "permitted resignation" that would entitle Devine to severance pay under the terms of the Xerox Personnel Manual. Trial Transcript, testimony of John S. Riley.

After submitting his letter, Devine remained at Xerox for three weeks. During that time, he continued to service his customers and train his replacement. At no time during that period did Riley, Berman, or any other person in the Xerox management hierarchy encourage Devine to remain with the company. Nor did they, at any point, indicate to Devine that he would not receive severance pay. However, Carolyn Reed, the Personnel Coordinator at Xerox's Wilmington Branch, advised Devine that his entitlement to severance pay was contingent upon his resignation being classified as a "permitted resignation."

On October 5, 1983, Devine was informed by letter that his request for permitted resignation had been denied. The letter from Berman to Devine states:

Dear Jack:

As a step in the review of your permitted resignation request, we have made several attempts to arrange a meeting between key members of the region senior staff and yourself. The purpose of the meeting was to ensure that the Region Manager and the BSG Senior

Management had all available information, including that which you could provide, on which to base their decision. You have refused to meet with the Region Manager, most recently on September 27, 1983.

Having considered all pertinent information available to us, we have concluded that your request for permitted resignation must be denied. Your termination from the company will be effective October 5, 1983.

Sincerely,
Robert Berman
Branch Manager, Sales
Wilmington Branch

Plaintiff's Exhibit 17.

Xerox now admits that the sole reason Devine was denied permitted resignation status, and therefore severance pay, was his refusal to attend an in person exit interview scheduled by Berman in Arlington, Virginia. The Xerox Personnel Manual does not advise that such an "exit" interview is required. The uncontradicted trial testimony reflects that the sole purpose of an exit interview is to provide the employee with an opportunity to present *his* grievance to the company. The interview is not intended to serve as a forum for determining one's eligibility for severance pay. According to Carolyn Reed, the Xerox Personnel Coordinator, the exit interview is designed to protect employees from local management fiat. Trial Transcript, testimony of Carolyn Reed.

## III. CONCLUSIONS OF LAW.

The Court has previously held that the Xerox severance pay plan in effect at the time of Devine's separation from Xerox is an employee welfare benefit plan covered by ERISA. *Devine v. Xerox Corp.*, 625 F.Supp. 603, 607 (D.Del.1985) (*citing* 29 U.S.C. § 1002(1)). Under Section 1002(1), an employee welfare benefit plan includes:

Any plan, fund, or program ... established or maintained by an employer ... to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for the participants or their beneficiaries,

through the purchase of insurance or otherwise (a) ... benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits ... or (b) any benefit described in Section 186(c) of this Title (other than pensions on retirement or death and insurance to provide such pensions).

29 U.S.C. § 1002(1).

■ Section 1002(1) incorporates by reference Section 186(c), which defines "benefits" to include "pooled vacation, holiday, severance or similar benefits...." 29 U.S.C. § 186(c)(6). Regulations promulgated by the Department of Labor under the aegis of ERISA provide that Section 1002(1)'s reference to Section 186(c) has the effect of "includ[ing] within the definition of 'welfare plan' those plans which provide holiday and severance benefits, and benefits which are similar...." 29 C.F.R. § 2510.3–1(a)(3). Since the plan in place at Xerox establishes the terms and conditions under which a departing employee would or would not be entitled to severance pay, it is clearly an employee welfare benefit plan of the type contemplated by ERISA. *See Patrella v. N L Industries, Inc.,* 529 F.Supp. 1357, 1361–62 (D.N.J.1982).

■ Under the Xerox Personnel Manual, there are two ways to leave Xerox—resignation and involuntary separation. An employee who voluntarily resigns from Xerox is not entitled to severance pay. Plaintiff's Exhibit 2, at 1. Devine's resignation, as a plain reading of his letter of resignation indicates, was not voluntary. Further support for this interpretation is found in Devine's immediate supervisor, Riley, signing the letter indicating an approval of its contents.

■ An involuntary separation results if one is "immediately discharged" or if one "resigns at the request of the company." *Id.* The category "immediate discharge" is reserved for serious and flagrant acts of misconduct, does not entitle the discharged employee to severance pay, and is not in issue here. The latter category, "resignation at the request of the company", is the focus of the Court's inquiry. Under this section of the Personnel Manual, when res-

ignation is requested by an employee's manager, and the employee consents, the resignation will be classified as a "permitted resignation" and severance will be paid. The Manual further provides that where inadequate performance is the basis for the involuntary separation "employees may be involuntarily separated only following efforts to obtain improvements in performance." Plaintiff's Exhibit 2, at 1. The preceding phrase refers to the Corrective Action Process.

The severance pay provision of the Personnel Manual states that "when termination is *initiated* by the Company for reasons other than a flagrant offense, employees are paid lump sum severance at the time of termination based on their length of service." Plaintiff's Exhibit 2, at 2. For the reasons stated in the Court's Findings of Fact, I conclude that Devine's termination was initiated by Xerox and that he qualified for severance pay under the terms of the Xerox Personnel Manual in effect at the time of his separation from Xerox.

A brief summary of the facts that led the Court to this conclusion is in order. Candid testimony adduced at trial reveals that Berman, the Wilmington Branch Manager for Sales, targeted Devine for disciplinary action early in his tenure as the Wilmington Branch Manager. Trial Transcript, testimony of Michael Mavromates. Soon thereafter, Devine found himself in the midst of the counseling stage of the corrective action process. Several months later, the company skipped over the oral warning stage, and accelerated Devine's status in the corrective action process to formal warning. The testimony of both Devine's and Xerox's witnesses points to the conclusion that few, if any, employees survive this stage of the process. The usual course of events appears to be progression to the probation stage of the process, followed by resignation at the request of the company. Under such circumstances the employee in question would qualify for permitted resignation and severance pay. Had Devine remained in the corrective action process, there is no reason to believe

he would have emerged unscathed. Xerox had reduced his sales territory from eleven to four acccounts; concomitantly, his sales quota had been increased. His major account, Hercules, had, with the knowledge of Xerox management, undertaken a decision to defer all major purchases. Devine's resignation is therefore appropriately characterized as involuntary separation from the company due to circumstances initiated by Xerox. Moreover, Devine clearly meets the eligibility criterion set forth in the Xerox severance pay plan because his termination was initiated by Xerox for "reasons other than a flagrant offense." In denying Devine's severance pay claim because he refused to attend an exit interview in Arlington, Virginia, Xerox, through its employee Robert Berman, acted arbitrarily. Further, the Court believes that Devine's treatment probably resulted from the poor relationship that existed between Berman and Devine.

■ Although I find that Devine qualified for severance pay under the terms of the Xerox Personnel Manual, the standard of review the Court is obliged to apply to Xerox's refusal to pay severance is whether the company acted arbitrarily and capriciously. *Rosen v. Hotel and Restaurant Employees & Bartenders Union*, 637 F.2d 592, 596 n. 2 (3rd Cir.), *cert. denied*, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981); *Carr v. Trustees of Hotel and Restaurant Employees & Bartenders International Union Pension Fund*, 585 F.Supp. 949, 950 (E.D.Pa.1984). *See also Blau v. Del Monte Corp.*, 748 F.2d 1348, 1353–54 (9th Cir.1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). Review under the arbitrary and capricious standard requires the Court to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). Factors relevant to whether Xerox acted arbitrarily and capriciously include: (1) the uniformity with which Xerox construed the severance pay plan; (2) whether Xerox's interpreta-

tion of the plan was contrary to its terms; (3) the fairness and reasonableness of the interpretation; and (4) unanticipated costs. *Carr, supra*, 585 F.Supp. at 952 (citing *Dennard v. Richards Group, Inc.*, 681 F.2d 306, 314 (5th Cir.1982)). The first factor—whether the plan at issue has been uniformly construed—weighs heavily against Xerox. Testimony adduced at trial concerning resignations by employees in the corrective action process leads me to the conclusion that Xerox had established a practice of treating resignations such as Devine's as "involuntary resignations" initiated by Xerox. In this posture, the company "allows" such employees to resign involuntarily, accords the status "permitted resignation", and pays severance. Trial Transcript, testimony of James R. Barnett, at 8, 9; testimony of Carolyn Reed, at 72, 73. I conclude that Xerox's treatment of Devine's application for severance pay was inconsistent with the treatment accorded past employees in the same or similar position. As to the second factor listed above, Xerox attempts to justify its denial of severance pay on the ground that Devine, on advice of counsel, refused to attend an exit interview in Arlington, Virginia. Plaintiff's Exhibit 17. This "requirement" is notably absent from the governing provisions of the Personnel Manual. Plaintiff's Exhibit 3. Since Xerox imposed upon Devine a standard not required by the Personnel Manual, I find the imposition of such a standard to be an arbitrary and capricious construction of the Xerox severance pay plan. *See Blau v. Del Monte Corp., supra*, 748 F.2d at 1354; *Morgan v. Mullins*, 643 F.2d 1320, 1321 (8th Cir.1981). After consideration of these two factors, I find more than ample evidence to support the conclusion that Xerox's denial of severance pay was arbitrary and capricious entitling Devine to be paid.

## IV. CONCLUSION.

Under the terms of the Xerox severance pay plan, Devine is entitled to six months severance pay, or $21,684.00, plus pre-judgment interest dating from August 15, 1983. *See Dependahl v. Falstaff Brewing Corp.*,

**358**

653 F.2d 1208, 1219 (8th Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981).

▮ Devine also requests an award of attorneys' fees for having successfully prosecuted this action. Under 29 U.S.C. § 1132(g), the Court is empowered, in its discretion, to award a reasonable attorney's fee and costs of the action to either party. Five policy issues normally come into play when a Court is requested to award fees in an ERISA case. These factors include: (1) the offending party's bad faith or culpability; (2) the offending party's ability to pay the fees; (3) the deterrent effect such an award would have on the offending parties; (4) the benefit conferred on the pension plan members as a whole; and (5) the relative merits of the partys' position. *Gray v. Dow Chemical Co.,* 615 F.Supp. 1040, 1045 (W.D.Pa.1985), *aff'd,* 791 F.2d 917 (3rd Cir. 1986); *Kann v. Keystone Resources, Inc.,* 575 F.Supp. 1084, 1096 (W.D.Pa.1983). The Court finds that all these policy considerations save one—the benefit conferred on the pension plan members as a whole—weigh in Devine's favor. Moreover, the absence of a common benefit is but one factor to be considered in determining the propriety of an award of attorneys fees. *Hollenbeck v. Falstaff Brewing Corp.,* 605 F.Supp. 421, 437 (E.D.Mo.1984), *aff'd,* 780 F.2d 20 (8th Cir.1985). Accordingly, the Court finds that plaintiff is entitled to recover reasonable attorneys' fees and costs in this matter.

An Order will be entered consistent with this Opinion.