Peter FOLTICE, Plaintiff–Appellant,

v.

GUARDSMAN PRODUCTS, INC., et al., Defendants–Appellees.

No. 94–2375.

United States Court of Appeals, Sixth Circuit.

Argued March 7, 1996.

Decided Oct. 30, 1996.

Mark S. Allard, Varnum, Riddering, Schmidt & Howlett (argued and briefed), Grand Rapids, MI, for Plaintiff–Appellant.

James Moskal, Warner, Norcross & Judd (argued and briefed), Grand Rapids, MI, for Defendant–Appellee.

Before: NELSON and SILER, Circuit Judges; WISEMAN, District Judge.*

NELSON, J., delivered the opinion of the court, in which SILER, J., joined.

WISEMAN, D.J. (pp. 939–43), delivered a separate dissenting opinion.

DAVID A. NELSON, Circuit Judge.

This is an appeal from a denial of attorney fees in an ERISA case that arises out of a disputed claim for pension benefits. On the facts presented, as we read the record, the denial of attorney fees reflects no abuse of discretion or other reversible error; we shall therefore affirm the district court's decision.

I

Plaintiff Peter Foltice, an employee of defendant Guardsman Products, Inc., suffered a severe knee injury at work early in 1976. Permanently disabled by the accident, Mr. Foltice has been receiving workers' compen-

sation benefits ever since. These benefits—which came to $429 per month in 1992—have been funded entirely by Guardsman. Mr. Foltice has performed no work for Guardsman since the date of his accident, which was January 19, 1976.

Pursuant to a labor agreement negotiated many years ago with the union that represented employees in Mr. Foltice's collective bargaining unit, Guardsman has long maintained a pension plan (the "Guardsman Products, Inc. Bargaining Employees' Retirement Plan") for its union employees. According to Article IV, § 4.7B of the Plan, pension benefits are not payable to a participant who is "receiving accident or sickness benefits under any plan to which the Company has contributed . . . ."

If the workers' compensation benefits received by Mr. Foltice constitute "accident" benefits within the meaning of § 4.7B, the language of the Plan precludes Mr. Foltice from receiving pension benefits too. If workers' compensation benefits do not constitute accident benefits, on the other hand, receipt of such benefits does not defeat the right of a participant to receive pension benefits as of a date—April 1, 1990, in Mr. Foltice's case—determined on the basis of the participant's age.

There is no evidence that Mr. Foltice requested or received a copy of the Plan itself until well after April 1 of 1990. As required by law, however (see § 101 of the Employee Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. § 1021)), Mr. Foltice was furnished a summary description of the Plan's terms. This "Summary Plan Description" stated that receipt of workers' compensation benefits would bar the payment of pension benefits. Written "in a manner calculated to be understood by the average plan participant," as required by § 102 of ERISA (29 U.S.C. § 1022), the Summary Plan Description told participants, in straightforward language, that:

"Benefits are not paid for periods during which you are receiving sickness and acci-

---

* The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

dent benefits from a Company-sponsored plan or worker's compensation benefits." Summary Plan Description, Paragraph 10, final sentence.

Mr. Foltice did not apply for pension benefits when he reached qualifying age in 1990. In 1992, however, he apparently presented an oral claim for such benefits in a conversation with Guardsman's Human Resources Director, Robert Chesnover. Mr. Chesnover contacted a representative of the Wyatt Company—an actuarial consulting firm that is said to have drafted the Guardsman pension plan—and was told by Wyatt that under § 4.7B of the plan "an employee will receive no benefit payments for the periods during which the employee received Workers' Compensation." Mr. Chesnover so advised Mr. Foltice, sending him a copy of Article IV of the Plan.

Mr. Chesnover was one of four members of a Pension Committee that had responsibility for general administration of the Plan. The other members were Bernadette Schafer, who was the Controller in Guardsman's Grand Rapids Division, and two union representatives. An affidavit executed by Ms. Schafer states (1) that Mr. Foltice's pension claim was discussed at a Pension Committee meeting attended by all four members; (2) that she (Ms. Schafer) indicated to the Committee that the plan contained provisions under which workers' compensation benefits were to be offset against pension benefits; and (3) that no member of the Committee disputed the proposition that there was to be an offset.[1] Although this discussion was not reflected in any minutes of the Committee, no one—including the union members—has challenged the accuracy of Ms. Schafer's account of what transpired.

When Mr. Chesnover advised Mr. Foltice that he could not receive pension benefits at the same time he was receiving workers' compensation benefits, Mr. Foltice consulted the attorney (Themis Fotieo) who had represented him on his workers' compensation claim. Attorney Fotieo called Mr. Chesnover, who referred him to § 4.7B of the Plan. Mr. Fotieo subsequently took the position that this section did not apply to workers' compensation benefits, pointing out that elsewhere in the plan document there were specific references to "workers' compensation" that appeared to exclude sickness and accident benefits of any other kind.[2] "Thus," Mr. Fotieo wrote in one of the letters he sent Guardsman's counsel, "I am led to believe that the drafter(s) of this document intended something different when they used the phrase 'workers' compensation' than when they used the phrase 'sickness and accident.'"

Guardsman called Mr. Fotieo's attention to the final sentence of Paragraph 10 of the Summary Plan Description, but Mr. Fotieo denied that this affected the meaning of the Plan instrument itself. "It is our belief," Mr. Fotieo wrote Guardsman's lawyers, "that the retirement plan does not allow for a deduction for workers' compensation benefits, notwithstanding the conflicting phrase in the 'Summary Plan.' We hereby demand that your client promptly start paying retirement benefits to our client ... [seeing] to it that his application is processed and that his payments are made up retroactively."

In connection with this demand, Mr. Foltice signed a retirement benefit election form in which he exercised an option to receive a reduced benefit so that his wife could obtain benefits too (at a rate 50 percent of his) if he should predecease her. Under this option the pension benefits to which Mr. Foltice would be entitled if his attorney's legal position were sustained came to $400.52 a month.

---

1. In actuality, as we have seen, accident benefits were not merely to be "offset" against pension benefits; under § 4.7B of the Plan as drafted, receipt of accident benefits would bar payment of pension benefits altogether, even where the pension benefits would have exceeded the accident benefits. Guardsman preferred the offset approach—an approach that may well have been intended all along, and that was obviously more favorable to employees—and the Wyatt Company subsequently undertook to rewrite the plan along these lines.

2. The parties subsequently stipulated that "[a]t least eight times in the Plan, Guardsman utilized the words 'Worker's Compensation Benefits' when they were referring to Workers' Compensation Benefit issues."

Following exercise of the option, Guardsman's attorneys sent Mr. Fotieo a letter rejecting the demand for payment of retirement benefits. The letter reiterated a previous suggestion that "[t]his plan has been interpreted to include workers compensation as an 'accident or sickness benefit,' "[3] and the letter went on to state that the plan "allows Guardsman a reasonable degree of leeway in how it interprets the plan." The rejection letter then continued as follows:

"The issue is not whether your client's interpretation of the plan is reasonable or whether there is a more reasonable interpretation of the plan. Under the controlling authority of the United States Supreme Court [a reference to *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)], the issue is whether Guardsman's interpretation of the plan is so unreasonable as to constitute an abuse of its discretion. We continue to believe that there has been no abuse of Guardsman's discretion and that its interpretation of the plan is fair, reasonable and legally justifiable."

The district court, as it turned out, disagreed with the conclusion that Guardsman's interpretation was legally justifiable. On cross-motions for summary judgment the court resolved the merits of the dispute in favor of Mr. Foltice. By judgment order entered on July 28, 1994, the district court awarded Mr. Foltice past due pension benefits of $20,827.04 and declared that Mr. Foltice was entitled to pension benefits of $400.52 per month for the rest of his life, with a survivor's benefit of $200.26 per month for Mrs. Foltice thereafter should he predecease her. There has been no appeal from this judgment.

Mr. Foltice subsequently moved for an award of prejudgment interest, costs, and attorney fees. The district court disposed of the motion by allowing costs of $120 and prejudgment interest of $2,559.64, while declining to award any part of the attorney fees sought. (The motion had requested "lodestar" attorney fees totaling $23,579.75, plus a 50 percent "multiplier.") Mr. Foltice has perfected a timely appeal from the portion of the order in which the court denied attorney fees.

II

■ Under § 502(g)(2) of ERISA (29 U.S.C. § 1132(g)(2)), the award of reasonable attorney fees is mandatory where a fiduciary has sued successfully to enforce an employer's obligation to make contributions to a multi-employer plan. In any other action under ERISA, however, the statute provides that "the court in its discretion *may* allow a reasonable attorney's fee and costs of action to either party." ERISA § 502(g)(1) (29 U.S.C. § 1132(g)(1)) (emphasis supplied). In cases of the sort before us here, our circuit recognizes no presumption as to whether attorney fees will be awarded. See *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1301–02 (6th Cir.1991), where we rejected the proposition—followed by the Ninth Circuit in *Smith v. CMTA–IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir.1984)—that a plan participant or beneficiary who wins an ERISA action "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."

■ When exercising the discretion vested in the district court by 29 U.S.C. § 1132(g)(1), we have said, the district court should consider the following five factors:

"(1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries

---

3. The parties subsequently stipulated that there were no minutes reflecting such an interpretation by the Pension Committee, and the defendants have acknowledged that there was no case prior to Mr. Foltice's in which benefits had been denied on this basis. The Summary Plan Description had been prepared before Mr. Foltice's claim arose, however, and Paragraph 10 of the Summary cannot be squared with § 4.7B of the Plan except as a reflection of the interpretation advanced by Guardsman—*i.e.*, the interpretation under which "accident or sickness benefits" includes workers' compensation benefits. As we have seen, this was the interpretation placed on the Plan by the actuarial consulting firm that had drafted the instrument in the first place.

of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions." *Sec. of Dept. of Labor v. King*, 775 F.2d 666, 669 (6th Cir.1985).

The five factors—sometimes referred to in this circuit as the *"King* factors," although they originated elsewhere—have been cited in numerous subsequent cases. See, *e.g.*, *Firestone Tire & Rubber Co. v. Neusser*, 810 F.2d 550, 556 (6th Cir.1987); *Central States Pension Fund v. 888 Corp.*, 813 F.2d 760, 767 (6th Cir.1987); *Sweet v. Consol. Aluminum Corp.*, 913 F.2d 268, 271 (6th Cir.1990); *Armistead*, 944 F.2d at 1301; *Tiemeyer v. Community Mutual Ins. Co.*, 8 F.3d 1094, 1101 (6th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1371, 128 L.Ed.2d 48 (1994); *Wells v. United States Steel*, 76 F.3d 731, 736 (6th Cir.1996).

The *King* factors are not statutory, of course, and need not be parsed as though they were. The factors simply summarize considerations that have sometimes been deemed significant in other cases—and, as the district court correctly noted in the case at bar, "[t]hese considerations represent a flexible approach; none of them is necessarily dispositive."

█ With regard to the first of the *King* factors—"the degree of the opposing party's culpability or bad faith"—the district court concluded that Guardsman's rejection of Mr. Foltice's claim for pension benefits "was erroneous, even arbitrary, but did not evidence a degree of culpability approaching bad faith." For reasons that we shall discuss in connection with the fifth factor, we doubt that Guardsman's rejection of the claim was "arbitrary." If Guardsman was culpable at all, however, we are satisfied that its culpability was relatively slight—and we fully agree with the district court that there was no bad faith here.

In his brief on appeal Mr. Foltice argues that the district court committed reversible error because it addressed the issue of bad faith "without considering the defendant's culpability." The argument is not persua-sive. The district court obviously did consider culpability, and found a higher degree of culpability than we would have done. If the district court erred in its assessment of culpability, the error hardly helps Mr. Foltice.

There is no dispute as to the second *King* factor; the defendants admittedly have the ability to pay reasonable attorney fees, and the district court so found. This factor alone is not dispositive, of course. See *Neusser*, 810 F.2d at 557.

The third factor—the deterrent effect of a fee award on other plan administrators—is one that is likely to have more significance in a case where the defendant is highly culpable than in a case such as this one. Honest mistakes are bound to happen from time to time, and fee awards are likely to have the greatest deterrent effect where deliberate misconduct is in the offing. The district court recognized this, concluding that the defendants' decision to deny Mr. Foltice's claim "does not present the sort of culpability that warrants punishment in his case or deterrence in others." We agree.

As to the fourth factor, the district court saw "no evidence that the plaintiff sought, through this action, 'to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA.'" Again we agree. The merits of the case do not turn on the resolution of any difficult ERISA question, and most of the participants in and beneficiaries of the Guardsman plan stood to gain nothing from this lawsuit.

It is true that there were four other Guardsman employees who happened to be in a situation comparable to Mr. Foltice's. As the district court correctly noted, however, the benefit realized by these four participants was "incidental;" the litigation did not result in the creation of a "common fund" within the meaning of the common law doctrine of that name. See *Armistead*, 944 F.2d at 1304, suggesting that the fourth factor "appears to be a codification of the common fund doctrine of the common law." [4]

---

4. The *Armistead* panel also noted that the fourth factor might weigh in favor of a plaintiff who showed that his suit could not have been brought at all but for the prospect of fee-shifting. In the case at bar Mr. Foltice was ably represented prior to suit by Attorney Themis Fotieo, and

We turn now to the fifth factor, "the relative merits of the parties' positions." As suggested above, it seems to us that any error committed by the district court with regard to this factor was an error in favor of Mr. Foltice.

In the opinion it delivered from the bench in announcing that summary judgment would be entered for Mr. Foltice and against Guardsman, the district court expressed the view that the phrase "accident or sickness benefits," as used in § 4.7B of the Plan, was a "term of art . . . consistently treated throughout the plan as excluding workers' compensation benefits. . . ." The court acknowledged that the Summary Plan Description expressly told participants—in "language [that] may very well describe the party's intent more accurately than does the plan itself"—that "benefits are not paid for periods during which you are receiving sickness and accident benefits from a Company-sponsored plan or workers' compensation benefits." But the court characterized the Summary Plan Description booklet as "extrinsic evidence" which "should not be used to add terms to a contract that is plausibly complete without them." In this connection the court noted that the booklet itself says that "[i]n the event of any conflict between this booklet and the plan document, the plan document will govern."

The district court's analysis is consistent with a view implied by the author of this opinion in *Musto v. American General Corp.*, 861 F.2d 897, 905 (6th Cir.1988), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989). Unfortunately for Mr. Foltice, however, our circuit has squarely held that where statements in a summary plan description are in conflict with the language of the plan itself, "the summary [plan description] shall govern." *Edwards v. State Farm Mutual Automobile Ins. Co.*, 851 F.2d 134, 136 (6th Cir.1988).

It is true that under the law of this circuit, language in a plan summary that is merely ambiguous should not be permitted to trump unambiguous language in the plan itself, particularly where participants receive both the plan and the summary in a single package. See *Lake v. Metropolitan Life Ins. Co.*, 73 F.3d 1372, 1379 (6th Cir.1996). In the case at bar, however, the language of the Summary Plan Description is not ambiguous—and we have no reason to believe that the Plan and the Summary were distributed to Guardsman employees in a single package. Accordingly, in our view, the statement in the Summary Plan Description that pension benefits would not be paid for periods in which workers' compensation benefits were being received should not have been dismissed as "extrinsic evidence."

This is not to say that Guardsman would necessarily have prevailed on the merits of the case if the Summary Plan Description had been given the consideration to which it was entitled. Elsewhere in the Summary, as the district court observed, "sickness and accident benefits" and "workers' compensation benefits" were not used as synonymous terms. Notwithstanding the deference accorded decisions made by plan fiduciaries in the exercise of their discretionary powers, see *Firestone Tire & Rubber*, 489 U.S. at 115, 109 S.Ct. at 956, it is conceivable that the district court would have resolved the merits in favor of Mr. Foltice even if the Summary Plan Description had been treated as an integral part of the Plan, as it should have been, and not relegated to the purgatory reserved for "extrinsic evidence."

Be that as it may, we can safely say that at the very least this was a closer case on the merits than the district court thought it was. Yet notwithstanding the flaw in the legal reasoning on which Mr. Foltice's claim for pension benefits was denied, the order concerning attorney fees makes the point, quoting *Armistead*, 944 F.2d at 1304, that the defendants' position was "no more devoid of merit than that of any other losing litigant."

there has been no showing that Mr. Fotieo declined to handle the litigation because of anything related to the prospect of fee-shifting. The firm that did handle the litigation—Varnum, Riddering, Schmidt & Howlett LLP—very generously agreed to take no fee other than one awarded by the court. The Varnum firm obviously recognized that the court might not award a fee, and was willing to prosecute the lawsuit anyway. The firm's willingness to take the case on this basis is commendable, but it does not satisfy the test suggested in *Armistead*.

Given our analysis of the relative merits of the parties' positions, the quoted words seem even closer to the mark than the district court realized.

Following its analysis of the five *King* factors, the district court's order concerning attorney fees used these words in stating the court's conclusion: "[T]he circumstances of this case do not justify a departure from the traditional 'American Rule' that each party ordinarily bears its own attorney fees." Citing *Armistead,* 944 F.2d at 1303, Mr. Foltice points out, correctly, that the American Rule has been repealed in ERISA cases. Mr. Foltice goes on to contend—incorrectly in our view—that the district court "relied" on the American Rule notwithstanding its repeal. What the district court relied on, we believe, was the *King* factors; it was the court's analysis of the *King* factors that drove the decision, as we read the order, and the reference to the "American Rule," in context, looks to us like little more than a rhetorical flourish.

█ Lest there be any misunderstanding, however, we take this opportunity to reiterate that neither the American Rule nor the opposing "English Rule" governs attorney fee questions in ERISA cases of this type. When Congress wants to provide that the loser shall pay the winner's attorney fees, it knows how to say so. See 29 U.S.C. § 1132(g)(2). Congress has not done that here. Neither has Congress seen fit to create any kind of statutory presumption regarding the payment of attorney fees in cases of this type. Congress having chosen to leave the matter for the courts to decide, in the exercise of their discretion, case-by-case, we think it would ill-behoove us to limit judicial discretion by creating a non-statutory presumption either for or against the award of attorney fees.

Mr. Foltice argues that there are strong policy reasons for "revisiting" the *Armistead* decision and establishing a presumption in favor of attorney fees for prevailing plaintiffs. But even if our circuit precedent rule did not require us to follow *Armistead*—and it does—we would consider it more appropriate for these arguments to be addressed to Congress.

Finally, acknowledging that this court may choose not to revisit *Armistead,* Mr. Foltice urges us to hold in any event that the district court abused its discretion in balancing the *King* factors. We decline so to hold. As the *King* panel noted, citing *Pue v. Sillas,* 632 F.2d 74, 78 (9th Cir.1980), "an abuse of discretion exists only when the court has the definite and firm conviction that the district court made a clear error of judgment in its conclusion upon weighing relevant factors." *King,* 775 F.2d at 669. Here we have no definite and firm conviction that the district court made an error of judgment. On the contrary, after examining the relevant factors ourselves, we have a definite and firm conviction that the district court reached the correct result.

The denial of attorney fees is **AFFIRMED.**

WISEMAN, District Judge, dissenting.

As recognized by the Second Circuit, ERISA's attorney fees provision is remedial legislation which should be liberally construed in order to vindicate the rights and protect the interests of those persons which it is meant to protect, i.e. participants in and beneficiaries of pension plans. *Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 871 (2d Cir.1987). The majority opinion is inconsonant with this approach.

Prior to severely injuring his knee on the job, Mr. Foltice was an employee of Guardsman Products, Inc., and its predecessor-in-interest for thirty years. As negotiated by his union, part of Mr. Foltice's compensation package during his thirty-year career with Guardsman included the pension benefits underlying this litigation. Although Mr. Foltice became eligible for his pension benefits in 1990, Guardsman began paying him only upon being ordered to do so by the district court in 1994. Notwithstanding this success in vindicating his rights, in light of more than $19,000 of legal fees and costs, Mr. Foltice's victory would have been hollow but for his attorneys' pledge to this Court that they would take no fees unless awarded by the court. While such a pledge does honor to the attorneys' sense of justice, it neither

corrects the district court's error in denying attorneys fees nor establishes a likely precedent for other attorneys in similar cases. Accordingly, the district court's errors in applying the *King*[1] test, particularly the first element of "culpability or bad faith," is compounded by the majority's affirmation of that decision. For the reasons that follow, I respectfully dissent.

## I

In considering whether attorney fees were warranted, the district court found that Guardsman's "denial of benefits was erroneous, even arbitrary, but did not evidence a degree of culpability evidencing bad faith."[2] As the election of the disjunctive "or" in *King* demonstrates, culpability and bad faith are not the same. This Court has defined "bad faith" as "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty." *Benkert v. Medical Protective Co.*, 842 F.2d 144, 149 (6th Cir.1988). On the other hand, culpability is defined merely as "blameworthiness," Black's Law Dictionary 379 (6th ed. 1990), "implying that the act or conduct spoken of is reprehensible or wrong, but not that it involves malice or a guilty purpose." *Werner v. Upjohn Co., Inc.*, 628 F.2d 848, 856–57 (4th Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981). To read *King* as the District Court did is to edit out the terms "culpability or" from *King.* Culpability and bad faith are not synonymous and defining culpability solely in terms of bad faith was clear error.

The majority dismisses the error, asserting "the district court obviously did consider culpability, and found a higher degree of culpability than we would have done." In affirming the district court in this manner, the majority disregards the plain language of *King* and ignores the record evidence.

"[C]ulpability evidencing bad faith" neither distinguishes between the two concepts nor indicates consideration of culpability separate and apart from bad faith. Rather than being an indication of separate consideration of the culpability factor, the finding that the denial of benefits was "erroneous, even arbitrary" is inherently a finding of culpability. The district judge went on to find Guardsman's refusal to be "downright unreasonable" and "an abuse of discretion, based on an illegitimate interpretation of plan language."[3]

This finding of culpability is supported by ample objective evidence in the record. In the letter of October 13, 1992, to Foltice's attorney, counsel for Guardsman asserted:

> This plan has been interpreted to include workers compensation as an "accident or sickness benefit." Employees have been advised of this by way of Page 10 of the Summary Plan Description which expressly states that no pension benefit will be paid during any period an accident or sickness benefit, including workers compensation, is received.

Guardsman could produce no evidence to support this assertion of a previous interpretation[4] and, by its own terms, the Summary Plan Description does not define an employee's benefits. Thus, these statements made in the context of dissuading Foltice from pursuing his pension benefits are inaccurate, misrepresentative, and, as such, evidence of defendants' culpability.

Likewise, in a 1992 Christmastime letter to Foltice's attorney, counsel for Foltice stated:

> Recognizing that you and your client want the plan interpreted differently, I suspect you will be tempted to rush off and file suit upon receipt of this letter. Before you do so, however, consider the following:

**1.** *Secretary of Department of Labor v. King,* 775 F.2d 666 (6th Cir.1985).

**2.** *Order Concerning Attorney Fees, Prejudgment Interest and Costs,* October 25, 1994, at page 2.

**3.** *Order Concerning Attorney Fees, Prejudgment Interest and Costs,* October 25, 1994, at page 2.; Summary Judgment Motion Hearing, July 18, 1994, transcript at 45.

**4.** *See Algie v. RCA Global Communications, Inc.,* 891 F.Supp. 875, 892 (S.D.N.Y.1994), *aff'd,* 60 F.3d 956 (2nd Cir.1995) (persistence in pressing varying explanations for an event that defendants ultimately could not document is plainly relevant to culpability).

Under the plan in question, Guardsman is vested with discretionary authority to determine eligibility and to construe the terms of the plan documents. This is significant, because it allows Guardsman a reasonable degree of leeway in how it interprets the plan. The issue is not whether your client's interpretation of the plan is reasonable or whether there is a more reasonable interpretation of the plan. Under the controlling authority of the United States Supreme Court, the issue is whether Guardsman's interpretation of the plan is so unreasonable as to constitute an abuse of its discretion.

This thinly veiled threat ("If you sue, you will lose") which relies on a conclusory and inaccurate statement of law and fact, and which was sent at a time (Christmas) when its impact could be most keenly felt, inescapably goes to culpability.

As this Court indicated in *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1304 (6th Cir.1991), the issue of fee-shifting is an evolving area of the law under ERISA and the *King* factors are merely a starting point. Diminishing the distinction between culpability and bad faith is not, however, a desirable evolutionary direction.

Beyond the instant case, the majority's decision sets bad precedent by collapsing "bad faith or culpability" into a single test. Whereas bad faith is subjective and requires proof of motives that discovery in a beneficiary claim is unlikely to generate, culpability is objective and more easily proven from discoverable observations. The Third Circuit, which applies the same five-factor test, recently reversed an order denying attorneys' fees because the trial court there made the same error, compressing "culpability or bad faith" into an inquiry focused on bad faith alone. *McPherson v. Employees' Pension Plan of American Re–Insurance Co., Inc.*, 33 F.3d 253 (3d Cir.1994). As *McPherson* recognized, "bad faith normally connotes an ulterior motive or sinister purpose. A losing party may be culpable, however, without having acted with an ulterior motive." *Id.* at 256; *see also DiSabatino v. DiSabatino Brothers, Inc.*, 894 F.Supp. 810, 818 (D.Del. 1995); *Vintilla v. United States Steel Corp.*,

642 F.Supp. 295, 296–97 (W.D.Pa.1986), *aff'd,* 815 F.2d 697 (3d Cir.), *cert. denied, Belak v. U.S. Steel Corp.*, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 100 (1987) (finding no bad faith but "certain elements of culpability attributable to plaintiffs").

In addition, there are practical reasons for refusing to collapse "culpability or bad faith" into a single test for bad faith. Courts, including our own, that have subsumed an examination of "culpability or bad faith" into an obsessive search for bad faith alone tend to over-emphasize the role of this first element of *King*'s five-part test. *See, e.g., Tiemeyer v. Community Mutual Insurance Co.*, 8 F.3d 1094, 1102 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1371, 128 L.Ed.2d 48 (1994); *McPherson*, 33 F.3d at 256 (stating "as we read the district court's comments, they appear to reflect a view that the first, third, and fifth factors cannot favor an award in the absence of a finding that the defendants have acted with a sinister motive"). This is contrary to our precedent. Proof of bad faith is not a threshold element of a successful claim under § 1132(g)(1). *Wells v. United States Steel*, 76 F.3d 731 (6th Cir.1996). "The punishment of bad faith litigants is a legitimate purpose under ERISA, but not the only purpose." *Armistead*, 944 F.2d at 1304. While courts ought to search for the presence or absence of bad faith in applying the *King* test, *Armistead* makes clear that such evidence, either way, is not outcome-determinative.

II

In regard to the third factor of *King*—the deterrent effect of a fee award on other plan administrators—the majority states that "[h]onest mistakes are bound to happen from time to time, and fee awards are likely to have the greatest deterrent effect where deliberate misconduct is in the offing." This reasoning is flawed. It will further the objectives of ERISA if fee awards are employed to deter behavior that falls short of bad faith conduct. *See Kann v. Keystone Resources, Inc. Profit Sharing Plan*, 575 F.Supp. 1084, 1096–97 (W.D.Pa.1983) (in case where culpability has been shown, fee award will make plan "less likely and not so quick to

deny benefits to other participants"). Even if Guardsman did not act in bad faith, the district court should have considered whether it would serve the objectives of ERISA to award counsel fees in an effort to deter conduct of the kind in which Guardsman engaged.

### III

A similar difficulty exists with the majority's analysis of *King*'s fourth factor—whether the party requesting fees sought to confer a common benefit or resolve significant legal questions. The majority concludes only that "the merits of the case do not turn on the resolution of any difficult ERISA question, and most of the participants in and beneficiaries of the Guardsman plan stood to gain nothing from this law suit."

*Armistead* instructs us to look beyond *King* in developing applicable considerations in ERISA fee-shifting determinations, particularly in regard to this factor and indicates that courts may provide the plaintiff with complete relief in appropriate cases, prevent the unjust enrichments of those who benefit from successful litigation, or remove deterrents to meritorious litigation by reducing the disparity between the resources available to the parties. 944 F.2d at 1304. *See Wells,* 76 F.3d at 736 (adopting *Armistead*'s suggestion to expand *King* to consider whether the economic situation of the plaintiffs is such that they could not bring suit except for the prospect of fee-shifting).

Rather than consider the unjust enrichment derived from this litigation by other similarly situated participants in the Guardsman plan, the majority cites *Armistead* as limiting their consideration of obvious, relevant factors. Conceding that four other Guardsman employees "happened to be in a situation comparable to Mr. Foltice's", the majority extracts dicta from *Armistead* that "suggests" that the "fourth factor 'appears to be a codification of the common fund doctrine of common law'" and indicates that this language is a *de facto* prohibition against consideration of "incidental" benefits derived by other participants which are not the result of litigation creating "a 'common fund' within the meaning of the common law doctrine of

that name." While the intent of this analysis is unclear, the result is both unjust and erroneous.

In *Mills v. Electric Auto–Lite Company,* 396 U.S. 375, 391–392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970), the Supreme Court articulated the philosophy underlying the "common fund" doctrine as follows:

> While the American rule is that attorneys' fees are not ordinarily recoverable as costs, both the courts and Congress have developed exceptions to this rule for situations in which overriding considerations indicate the need for such recovery. A primary judge-created exception has been to award expenses where a plaintiff has successfully maintained his suit, usually on behalf of a class, that benefits a group of others in the same manner as himself. . . .
>
> To allow the others to obtain full benefits from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense.

Clearly, the dispositive issue is not whether the benefit derived by others is "incidental", nor whether "most of the participants in and beneficiaries of the Guardsman plan stood to gain nothing from this lawsuit." Others clearly benefitted from this litigation at plaintiff's expense. To fail to consider this fact based upon an artificial construction of the "common fund" theory is inequitable.

### IV

In the same manner, the majority strictly construes "the test suggested in *Armistead*" to dismiss consideration of whether the plaintiff's case could have been brought at all but for the prospect of fee-shifting. There is ample evidence in the record that Foltice could not have afforded to litigate this action without fee-shifting. Now 76 years old, Foltice has not worked since a knee injury in 1976. His only income, outside his pension, is a $372 monthly workers compensation payment. Foltice's attorneys at Varnum, Riddering, Schmidt & Howlett spent 119.75 hours (excluding this appeal) during nearly three years of litigation, time no doubt enlarged by Guardsman's repeated insistence

on its "downright unreasonable"[5] positions. Foltice's lawyers' fees of $19,672.25 would, if insisted upon, deprive him of his entire lump sum award and more than a third of his expected pension.

By finding, as the majority does, that the so-called *Armistead* test is not satisfied because plaintiff was not actually denied access to the courts punishes the attorneys in this case for their noble gesture. Moreover, because it is unclear under this facile approach what circumstances would constitute a showing that a "suit could not have been brought at all but for the prospect of fee-shifting", a "Catch–22" situation is created for future ERISA plaintiffs and attorneys, i.e. there can be no consideration of the issue unless the case is brought into court. Moreover, instead of encouraging emulation of the laudatory conduct evinced by the attorneys in this case, the majority discourages other attorneys from advocating on behalf of ERISA plaintiffs, a segment of the population least able to afford litigation expenses.

### V

With regard to the fifth factor—the relative merits of the parties positions—the majority concludes that the district court's failure to consider language in the summary plan as dispositive was error in Mr. Foltice's favor. This conclusion is based on an assertion that this Circuit "has squarely held that where statements in a summary plan description are in conflict with the language of the plan itself, the summary plan description shall govern." This assertion is simply incorrect.

*Edwards v. State Farm Mutual Automobile Ins. Co.*, 851 F.2d 134 (6th Cir.1988), relied on by the majority as authority for this position, pertains to a case where the plaintiffs detrimentally relied on a summary plan description. Detrimental reliance is not an issue here. Even accepting arguendo that *Edwards* is not distinguishable on that basis and does, in fact, stand as authority for the position asserted, then in light of 6th Circuit jurisprudence, *Edwards* must be viewed as an anomaly. *See Bryant v. International*

*Fruit Products Co.*, 793 F.2d 118, 123 (6th Cir.), *cert. denied*, 479 U.S. 986, 107 S.Ct. 576, 93 L.Ed.2d 579 (1986) ("the handbook is not a part of the plan agreement and cannot be relied upon to modify or affect any provision of the plan ..."); *Musto v. American General Corp.*, 861 F.2d 897 (6th Cir.1988), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989) ("Such an assumption would conflict with what is said in the booklets ('the official Plan Documents will govern'), it would conflict with what is said in the policy ('[t]his Policy ... shall constitute the entire contract') and it would seem in conflict with what is said in ERISA (the plan must be established pursuant to 'a written instrument,' of which the participants are to be furnished a 'summary')").

*Edwards* is clearly not pertinent to this case. Consideration of the summary plan would not have altered the district court's determination on the merits and, with regard to the relative merit of the parties positions under *King*, is weightless.

### VI

A district court's discretion, properly guided by the *King/Armistead* methodology and subject to appellate review for abuse of the same, is adequate to protect the interests of ERISA beneficiaries and claimants. However, a danger is created when, as indicated by the underlying tenor of the majority's opinion in this case, an implicit presumption against awarding attorney fees is derived from the absence of a presumption in the prevailing plaintiff's favor. Based on the district court's abuse of discretion in misinterpreting the "culpability or bad faith" element of *King* and in failing to consider Foltice's financial ability to obtain a legal remedy for his deprived rights without fee-shifting, I would reverse the order of the District Court and remand for further consideration consistent herewith.

---

5. *Order Concerning Attorney Fees, Prejudgment Interest and Costs*, October 25, 1994, at page 2; Summary Judgment Motion Hearing, July 18, 1994, transcript at page 45.